# United States District Court
# For The Northern District Of New York

**UNITED STATES OF AMERICA,**

        v.

**MOJTABA BIRIA,**
               **Defendant.**

**DEFENDANT'S FIRST
SENTENCING MEMORANDUM**

Criminal Action Number:
1:18-CR-163-001 (MAD)

## A. INTRODUCTION

The most important task in a sentencing is to determine someone's true heart.

It is where that person truly resides and where we discover what Justice represents in this case. Judges perform this quintessential task constantly and effectively utilizing their own humanity and experience, and that of the person standing before them. It is paramount to a full Justice.[1]

It doesn't matter where you come from in the world. It doesn't matter what governments are growling, threatening, and fighting with each other and who try to deny this simple fact.

## B. HISTORY, BACKGROUND AND CHARACTERISTICS OF MOJTOBA BIRIA

I have known Moji Biria now for almost two years. We are about the same age, just short of seventy years old. Moji turns seventy-years-old in three weeks. Not only do we share the same aches and pains and the disease of type II diabetes, but we believe the same things about family and people in general. I am proud of him for his

---

[1] Whether that is denominated as History, Background, and Characteristics, or another of the 18 U.S.C. §3553(a) factors, or is derived from federal sentencing case law, or whether it is regarded as revealed intention or motive.

strength during his incarceration here, an ocean and continent away from his family in Germany, and his from own doctors, all this time.

Moji is by education and training an engineer. He earned his bachelor's degree at Northrup University and earned a master's degree in Iran. He is fluent in three languages, has worked in industry, and in university settings.

He is not a spy, a killer, a terrorist, a bomber, a hater, one who encourages any form of violence, nor does he match any other of the stereotypical labels some might love to so easily put upon him because he was born an Iranian.

And there are observable differences in the nature of what people actually do as they violate the law. Some seek exactly to hurt others. Here, Moji was buying from a company in the United States parts for gas turbine generators. Not Uranium, not weapons, not guns, not bombs, or jets, or missile. Gas turbine generators for electricity only, and of a power not at all that immense or strong to be used for any militaristic production of missiles or other similar weapons.[2]

What Moji was doing, in breaking the law, was buying parts (and repair parts) for electrical power from gasoline, for businesses, and the towns of his people. The men, women, and children who live in Iran need gasoline powered electricity to do so. It was to destroy nothing. It was to hurt no one. It was a civil purpose to a civil end, wholly within the borders of that land. It was not militaristic, weaponized, or weapons-producing in its nature and extent.

### C. <u>APPLICATIONS FOR GUIDELINES DEPARTURES, VARIAINCES OR A NON-GUIDENLINES SENTENCE</u>

There are six separate, discrete, distinct, and compelling reason to deviate or depart from the calculated advisory guidelines in sentencing Mojtaba Biria in this case.

---

[2] Frame 5, Frame 6 and Frame 9 beginning at 25MV and in existence since 1939.

1. **THIS IS A FIRSTTIME CONVICTION AT SEVENTY YEARS OLD AND THE DEFENDANT HAS OTHERWISE LIVED A BLAMELESS LIFE WITHOUT LEGAL ENTANGLEMENTS.**

Moji has at no other time been reported to have been arrested, charged, or convicted of any offense, minor or serious in nature. He had previously never been in jail even for one day. The life that is described in the Presentence Investigation Report through Moji's education, raising his family, working in multiple environments, and pursuing his several levels of education (even in the United States) would reveal any such conduct in his past. His conduct, other than in this matter, as it pertains to his education, business conduct, and responsible family life all weigh against that. Moji's first conviction is at seventy years of age.[3]

2. **GIVEN MULTIPLE FACTORS INCLUDING AGE, MEDICAL CONDITION AND PHYSICAL REMOVAL FROM THE UNITED STATES, RECIDIVISM IS UNLIKELY.**

The United States Sentencing Commission produced a study which demonstrated that the older an offender becomes, the less likely it is that they will reoffend. It provides and applies per force to Moji. Especially after his nearly two years of incarceration here in jail, it is unlikely that he, in this elderly condition, would repeat criminal activity of any sort.[4]

---

[3] U.S. v. Smith (4th Cir. April 23, 2008), 2008 WL 1816564 (unpub.) (where guidelines 78-97 months, sentence of 24 months not abuse of discretion where district court noted defendant was 64 years of age and **had avoided violations of the law" up until this point in his life**"; U.S. v. Hanson 561 F.Supp.2d 1004 (E.D. Wisc. 2008) (where guidelines 210-262 months, court imposes sentence of 72 months in part because he was 49 years of age and **"had no prior record whatsoever" and "he had never before been to jail for even one day"**); U.S. v. Ward, 814 F.Supp. 23 (E.D.Va. 1993) (departure warranted because **guidelines fail to consider length of time defendant refrains from commission of first crime**, here until age 49); U.S. v. Collington, 461 F.3d 805 (6th Cir. 2006) (where guidelines 188 -235, sentence of 120 months affirmed in part because the criminal history did not reflect that "this incident was the first time that this quantity of drugs and guns had been found in Collington's possession.); U.S. v. Germosen 473 F.Supp.2d 221, 227 (D.Mass. 2007) (below guideline sentence of 6 months home detention warranted in part because first offense and " there is a **demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I**.")

[4] USSG §5H1.1 was liberalized to state that age "may be relevant" as to whether downward departure should be granted. **Also "age may be a reason to depart downward in a case in which the defendant is elderly and infirm."**

U.S. v. Payton, 754 F.3d 375 (6th Cir. 2014) ("The Sentencing Commission has observed that **"[r]ecidivism rates decline relatively consistently as age increases."** Further "Recent analysis from the Bureau of Justice Statistics considering the recidivism rates of released prisoners in 30 states (including Michigan) from 2005 to 2010 supported the Commission's conclusion, finding decreased recidivism rates as prisoners age….These statistics suggest that past fifty years old there is a significantly lower rate of recidivism." );
United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines 12 (2004)availableat<http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

### 3. WITH THE DEFENDANT'S ADVANCED AGE, HE SUFFERS MORE ACCUETLY FROM MULTILPLE MEDICAL CONDITIONS IN PRISON, SOME OF WHICH CANNOT BE REVERSED, AND HE NEEDS TO RETURN TO THE CARE OF HIS OWN CIVILIAN DOCTORS OUTSIDE CONFINEMENT.

Moji suffers from health problems. The Probation Department describes these conditions in more detail, but he is a type II diabetic and is insulin-dependent. He has undergone surgery on his back some years ago. He suffers from high cholesterol over a period of years, an enlarged prostate which is symptomatic, and has undergone surgeries on his back, suffers from varicose veins, hypertension, and is hard of hearing. He is presently treated,

---

publications/2004/200405_Recidivism_Criminal_History.pdf **("[r]ecidivism rates decline relatively consistently as age increases ("Recidivism rates decline relatively consistently as age increases,"** from 35.5% under age 21 to 9.5% over 50) *Payton*, at id ("Both the Guidelines and our Circuit's cases explicitly acknowledge that a defendant's age, and specifically old age, is a relevant consideration in sentencing. U.S.S.G. § 5H1.1; *U. S. v. Berry*, 565 F.3d 332, 341 (6th Cir. 2009); ("observers of the criminal justice system have long acknowledged the "**key**" argument "**that elderly offenders pose so low a risk to the public that long or otherwise harsh sentences have little to no utilitarian benefit.**"). U.S. v. Carter, 538 F.3d 784 (7th Cir. 2008) (where 61-year-old defendant convicted of money laundering and tax fraud and guidelines 87-108 months, district court's sentence of 24 months reasonable in part because defendant's age is relevant to risk of recidivism and "the likelihood of recidivism is a proper sentencing consideration. 18U.S.C. § 3553(a)(2)(C) U.S. v. Smith (4th Cir. April 22, 2008) 2008 WL 1816564 (unpub.) (case where guidelines 78-97 months, sentence of 24 months not abuse of discretion where district court noted among other things that defendant was 64 years of age and had avoided violations of the law" up until this point in his life") U.S. v. Davis 458 F.3d 491 (6th Cir. 2006) (in fraud case where guidelines 36 months, district court's sentence of one day because of 14 year delay in sentencing and because defendant 70 at time of sentencing reversed as too low, but on remand court can consider age because " In an appropriate case, a trial court, **in exercising the "broad discretion" that *Booker* gives it "in imposing a sentence within a statutory range," has a freer hand to account for the defendant's age in its sentencing calculus** under § 3353(a) than it had before *Booker*."); U.S. v. Gray 453 F.3d 1323 (11th Cir. 2006) (where low end of guidelines was 151 months, district court's sentence of 72 months was reasonable because court took into consideration the Section 3335(a) factors which include the **"history and characteristics of the defendant—here "the defendant's age,** prior minimal record, and his medical condition" Defendant was 64, had never molested a child, suffered from depression and tried to commit suicide several times). Even under the advisory guidelines, **"age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly <u>and</u> infirm**." See U.S. v. Hildebrand, 152 F.3d 756 (8th Cir. 1998) (affirmed downward departure for 70-year old from range of 51-63 months to probation with 6 months in home confinement where he was a bookkeeper for a group convicted of mail fraud and had life-threatening health conditions – even though court of appeals said it would not have granted a departure); U.S. v. Bariek 2005 WL 2334682 (E.D.Va., Sept. 23 2005) (unpub.) (where defendant convicted of operating unlicensed money business (sending funds to Afghanistan), guideline range of 37-46 months greater than necessary and sentence of 18 months imposed in part because "this is the defendant's first criminal offense. Further, there is no indication that the defendant poses a risk of recidivism**.** For each of these reasons, the Court finds no compelling rehabilitation need as would be served by a lengthy term of incarceration."); U.S. v. Lucania 379 F.Supp.2d 288, 297 (E.D.N.Y. 2005) ("Post-*Booker* courts have noted that **recidivism is markedly lower for older defendants**."). U.S. v. Carmona-Rodriguez 2005 WL 840464, 4 (S.D.N.Y. April 11, 2005) (unpub.)(where 55 year old woman pled guilty to distribution of drugs sentence of 30 months (below guideline range) proper in part "in view of the low probability that Carmona-Rodriguez will recidivate." Defendants "over the age of forty... exhibit markedly lower rates of recidivism in comparison to younger defendants See *Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines,* at 12, 28 (2004)); Simon v. U.S. 361 F.Supp.2d 35 (E.D.N.Y. 2005) **"The Guidelines' failure to account for this phenomenon renders it an imperfect measure of how well a sentence protects the public from further crimes"** of the defendant.); U.S. v. Nellum , 2005 WL 300073 (N.D. Ind. Feb. 3, 2005)(unpub.) (where 57-year old defendant convicted of distributing crack-cocaine; and his guideline sentencing range was 168-210 months, sentence of 108 months because court had also to consider the need to deter Nellum and others from committing further crime under § 3553(a)(2). **A guideline sentence would mean the defendant would be over the age of seventy at his release.** The court's sentence will cause his release at 65 and "The likelihood of recidivism by a 65 year old is very low." *See* United States Sentencing Commission Report released in May, 2004) (located at http://ww w.ussc.gov/publicat/Recidivism-General.pdf.)

even in the jail, with eight medications including insulin, Metformin, Januvia, Zocor, Losartan and Metoprolol all along with Flomax and Dutasteride.

We also know from articles and studies that the graying of the prison population presents particular challenges and dangers to elderly inmates. Not only are they intrinsically more vulnerable simply due to their age and inability to defend themselves, but this is compounded by their medical conditions, and even whether some of the necessary medications are allowed in the prison system at all. The Bureau of Prisons reminds us they are not a retirement home nor a convalescent home in their purpose or function. Elderly inmates bear heavy medical and social costs, often in cramped quarters, sometimes with much younger inmates. They are subject to psychological and physical abuse and may exhibit symptoms of elderly dementia misunderstood for disobedience thereby invoking discipline. The Bureau of Prisons had to invade highway funds recently to pay for medical care in some fashion. Elderly prisoners find the prison's physical environment difficult as there are often not elevators and the halls and stairways are not easy to navigate for older people. There is an acute lack of staff for them, as well. They may require lower bunks, handicapped accessible cells, and face overcrowding. If nothing else, the government knows that housing elderly prisoners presents management problems, safety problems, and greater cost to the government.[5] The situation may rise to a form of constitutionally impermissible cruel and unusual punishment.

---

[5] "Incarcerated individuals face substantial health risks. When prisons are at capacity or overcrowded, **the risk of inmate injury, sexual victimization, disease transmission and death can increase**." President's Report (April 2016), ECONOMIC PERSPECTIVES ON INCARCERATION AND THE CRIMINAL JUSTICE SYSTEM at p. 48, found at https://www.whitehouse.gov/sites/default/files/page/files/20160423_cea_incarceration_criminal_justice.pdf
"**BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population** and provide limited training for this purpose." U.S. Justice Dept. Report (May 2015) *The Impact of An Aging Prisoner Population on the Bureau of Prisons*, Executive Summary Found at https://oig.justice.gov/reports/2015/e1505.pdf. "**The physical infrastructure of BOP institutions cannot adequately house aging inmates. Aging inmates often require lower bunks or handicapped -accessible cells but overcrowding throughout the BOP system limits these types of living spaces. Aging inmates with limited mobility also encounter difficulties navigating in situations without elevators and with narrow sidewalks or uneven terrain."** *Id*. "Aging inmates are more costly to incarcerate primarily due to their medical needs." Moreover, wait times for treatment in outside prison hospitals is unacceptably long. "For example, using BOP data from one institution, we found that **the average wait time for inmates, including aging inmates, to be seen by an outside medical specialist for cardiology, neurosurgery, pulmonology, and urology to be 114 days**." *Id*. "Management problems with elderly inmates are intensified in the prison setting and include: **vulnerability to abuse and predation, difficulty in establishing social relationships with younger inmates, need for special physical accommodations in a relatively inflexible physical environment.** *Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, U.S. Department of Justice, National Institute of Corrections, 2004 edition, pp 9 and 10. The report notes on page 10 that **first time offenders are "easy prey for more experienced predatory inmates."** It should be noted that throughout the report, the elderly are defined by the various institutions as 50 or older. **Older prisoners cost more than younger ones,** due largely to increased health-care costs and other related expenses (see, e.g., http://www.pewtrusts.org/en/research-and-analysis/analysis/2014/10/03/prison-population-continues-to-age --- a pew report explaining that "The National Institute of Corrections pegged the **annual cost of incarcerating prisoners 55 and older with chronic and terminal illnesses at, on average, two to three times that of the expense for all other inmates, particularly younger ones. More recently, other researchers have found that the cost differential may be**

## 4. THE DEFENDANT FACES COLLATERAL CONSEQUENCES AND PUNISHMENTS IN ADDITION TO INCARCERATION ITSELF.

As a deportable and removable person, Moji's tenure in prison will be more different from others. He will be removed from the United States upon completion of the custodial portion of his sentence. He will be deprived of the opportunity for a halfway house due to his deportable status. Similarly, he will be deprived of community confinement. He cannot participate in work release. He cannot receive intermittent incarceration. Nor can he receive a minimum-security designation. This results in an unwarranted increase in the severity of his sentence, to include denial of early release. The consequences are severe, unfair and not applicable to others. It results in a harsher confinement.[6]

---

**wider.**"). The sentence imposed must ensure that "needed . . . medical care" is provided "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). **The Sentencing Commission now recognizes that "[p]hysical condition . . . may be relevant in determining whether a departure is warranted,"** and has always recognized that "in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." USSG § 5H1.4, p.s. An audit by the Office of the Inspector General found systemic deficiencies in the Bureau of Prisons' delivery of health services. It found that at a number of institutions, the Bureau of **Prisons "did not provide required medical services to inmates," including inadequate treatment for chronic conditions, failure to properly monitor side effects of medication, allowing unqualified providers to render medical services, and failure to meet performance target levels on treatment of serious conditions, including diabetes.** See: U.S. Dep't of Justice, Office of the Inspector General Audit Division, The Federal Bureau of Prison's Efforts to Manage Inmate Health Care ii-xix, 32-34 (2008), available at www.justice.gov/oig/reports/BOP/a0808/final.pdf. A similar result was obtained in 2016. See Office of the Inspector General U.S. Department of Justice Review of the Federal Bureau of Prisons' Medical Staffing Challenges Evaluation and Inspections Division 16-02 March 2016, EXECUTIVE SUMMARY, "The Federal Bureau of Prisons (BOP) is responsible for incarcerating federal inmates and is required to provide them with medically necessary healthcare. **However, recruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs. Additionally, medical staff shortages can impact prison safety and security."**

[6] U.S. v. Navarro-Diaz, 420 F.3d 581 (6th Cir. 2005) (district court noted **defendant would be punished more than citizen because not eligible for six months half way house at end of sentence**); U.S. v. Davoudi, 172 F.3d 1130 (9th Cir.1999) (district court had discretion to depart downward because **deportable alien may be unable to take advantage of minimum security designation** of the up to six months of home confinement authorized by 18 U.S.C. §3624(c); U.S. v. Charry Cubillos, 91 F.3d 1342, 1344 (9th Cir.1996); U.S. v. Farouil, 124 F.3d 838 (7th Cir. 1997) (district court may consider whether defendant's status as a deportable alien would result in **unusual or exceptional hardship in conditions of confinement that might warrant a departure** (ineligible for home detention, community confinement, work release, intermittent incarceration, or minimum security designation); U.S. v. Pacheco-Soto 386 F.Supp.2d 1198, 1205 (D.N.M.2005)(in drug case where guideline 74 months, 60 month below guideline sentence imposed because defendant is deportable alien who **"faces a unwarranted increase in the severity of his sentence**. He likely will not eligible for any early release, he will not be able to serve his sentence in a minimum security prison, and he may not qualify for reduced credits for participation in a residential drug or alcohol abuse program. These consequences are severe and unfair.") U.S. v. Bakeas, 987 F.Supp. 44 (D. Mass. 1997) (departure from 12 months to probationary sentence and home confinement for legal resident alien convicted of embezzlement because he was ineligible for minimum security confinement); U.S. v. Smith, 27 F.3d 649 (D.C.Cir.1994) (status as a deportable alien subjects him to harsher confinement because ineligible for benefits of early release (to CTC) and not eligible for minimum security prison; so court has authority to consider downward departure).

### 5. REMORSE AND CONTRITION

Moji is duly contrite and exceedingly remorseful. Of all the things that may be taken from Moji, this cannot. Moji's contrition and remorse are real and actual and not the product of denial or self-pity over this long time in confinement. And, this does not originate from the unalterable losses personally visited upon him by reason of his offense. No, his remorse is genuine, and it is a sincere, unending remorse.

### 6. EFFECTS OF FEDERAL PRETRIAL CONFINEMENT IN LOCAL INCARCERATION

Moji has been held in local county jail since his arrest in 2017. That represents a substantial amount of dead time while not being able to participate in any beneficial and salutary constructive and rehabilitative program, nor any treatment, as a federal pretrial detainee. It is simply the mind-numbing warehousing of a human being. There is no opportunity for betterment, for education, or to participate in any other important services or programs that would advance learning and be a beneficial factor to present at sentencing.

And, the time spent in this manner is its own substantial penalty and punishment and is entitled to greater credit for this reason. Such barebones confinement is something not contemplated by the guidelines nor representative of the manner of imprisonment utilized or recommended at the Federal Bureau of Prisons.

### D. CONCLUSION AND SENTENCING RECOMMENDATION

For the reasons set forth above, it is respectfully prayed that this Court impose upon Mojtaba Biria a term of imprisonment substantially below the advisory guideline, and below the statutory maximum, through implementation of a non-guidelines sentence commensurate with this sentencing application.

This would best serve the individualized needs of the defendant, balanced with the goals, functions and purposes of sentencing in the interests of justice.

It is further prayed that Mojtaba Biria be directed to participate in such programs for which he is eligible (if any), together with such other, further and different relief as this Court deems just and proper.

Respectfully submitted,

*Robert G. Wells*

**ROBERT G. WELLS, ESQ.**
Bar Roll Number: 505778
Attorney for MOJTABA BIRIA
Office and Post Office Address
120 East Washington Street
Syracuse, New York 13202
Telephone: (315) 472-4489

Respectfully submitted,

*Steven Metcalf*

**STEVEN METCALF, ESQ.**
Attorney for MOJTABA BIRIA
Office and Post Office Address
Suite 615; 11 Broadway
New York, New York 10004
Telephone: (718) 607-5999